EXHIBIT 3

Table of Contents

United States
Securities and Exchange Commission
Washington, D.C. 20549

# Form 10-K

Annual report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934
for the fiscal year ended December 31, 2005

Commission file number 001-6351

# Eli Lilly and Company

An Indiana corporation         I.R.S. employer identification no. 35-0470950
Lilly Corporate Center, Indianapolis, Indiana 46285
(317) 276-2000

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange On Which Registered |
| --- | --- |
| Common Stock (no par value) | New York Stock Exchange |
| Preferred Stock Purchase Rights | New York Stock Exchange |
| 8-3/8% Notes Due December 1, 2006 | New York Stock Exchange |
| 6.57% Notes Due January 1, 2016 | New York Stock Exchange |
| 7-1/8% Notes Due June 1, 2025 | New York Stock Exchange |
| 6.77% Notes Due January 1, 2036 | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes X No ___

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ___ No X

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months, and (2) has been subject to such filing requirements for the past 90 days. Yes X No ___

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in the definitive proxy statement incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ]

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer or a non-accelerated filer.

    [X] Large accelerated filer    [ ] Accelerated filer    [ ] Non-accelerated filer

Indicate by check mark whether the Registrant is a shell company as defined in Rule 12b-2 of the Act: Yes ___ No X

Aggregate market value of the common equity held by non-affiliates computed by reference to the price at which the common equity was last sold as of the last business day of the Registrant's most recently completed second fiscal quarter (Common Stock): approximately $54,624,800,000

Number of shares of common stock outstanding as of February 15, 2006: 1,129,982,580

Portions of the Registrant's Proxy Statement to be filed on or about March 13, 2006 have been incorporated by reference into Part III of this report.

## TABLE OF CONTENTS

Part I
    Item 1.Business
    Item 1A.Risk Factors
    Item 1B.Unresolved Staff Comments
    Item 2.Properties
    Item 3.Legal Proceedings
    Item 4.Submission of Matters to a Vote of Security Holders
Part II
    Item 5.Market for the Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities
    Item 6.Selected Financial Data
    Item 7.Management's Discussion and Analysis of Results of Operations and Financial Condition
    Item 7A. Quantitative and Qualitative Disclosures About Market Risk
    Item 8.Financial Statements and Supplementary Data
Consolidated Statements of Income
Consolidated Balance Sheets
Consolidated Statements of Cash Flows
Consolidated Statements of Comprehensive Income
Segment Information
Selected Quarterly Data (unaudited)
Selected Financial Data (unaudited)
Notes to Consolidated Financial Statements
Management's Reports
Report of Independent Registered Public Accounting Firm
Report of Independent Registered Public Accounting Firm
    Item 9.Changes in and Disagreements with Accountants on Accounting and Financial Disclosure
    Item 9A.Controls and Procedures
    Item 9B.Other Information
Part III
    Item 10. Directors and Executive Officers of the Registrant
    Item 11.Executive Compensation
    Item 12.Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters
    Item 13.Certain Relationships and Related Transactions
    Item 14.Principal Accountant Fees and Services
    Item 15.Exhibits and Financial Statement Schedules
Signatures
Index to Exhibits
By-laws, as amended
Bonus Plan, as amended
Summary of 2006 Compensation for Non-Employee Directors
Summary of 2006 Compensation for Named Executive Officers
Statement Re: Computation of Ratio of Earnings from Continuing Operations to Fixed Charges
List of Subsidiaries
Consent of Independent Registered Public Accounting Firm
Rule 13a-14(a) Certification of Chairman of the Board and CEO
Rule 13a-14(a) Certification of Executive VP and CFO
Section 1350 Certification

- Our results can also be affected by internal factors, such as changes in business strategies and the impact of restructurings, asset impairments, technology acquisition and disposition transactions, and business combinations.

**Cautionary Statement Regarding Forward-Looking Statements**

We have made certain forward-looking statements in this Form 10-K, and company spokespeople may make such statements in the future based on then-current expectations of management. Where possible, we try to identify forward-looking statements by using such words as "expect," "plan," "will," "estimate," "forecast," "project," "believe," "anticipate," and similar expressions. Forward-looking statements do not relate strictly to historical or current facts. They are likely to address our growth strategy, sales of current and anticipated products, financial results, the results of our research and development programs, the status of product approvals, and the outcome of contingencies such as litigation and investigations. All forward-looking statements made by us are subject to risks and uncertainties, including those summarized above, that may cause actual results to differ materially from our expectations.

We undertake no duty to update forward-looking statements.

# Item 1B. Unresolved Staff Comments

Not applicable.

# Item 2. Properties

Our principal domestic and international executive offices are located in Indianapolis. At December 31, 2005, we owned 13 production and distribution facilities in the United States and Puerto Rico. Together with the corporate administrative offices, these facilities contain an aggregate of approximately 12.2 million square feet of floor area dedicated to production, distribution, and administration. Major production sites include Indianapolis; Clinton and Lafayette, Indiana; and Carolina, Guayama, and Mayaguez, Puerto Rico. We are constructing a new production facility in Prince William County, Virginia.

We own production and distribution facilities in 13 countries outside the United States and Puerto Rico, containing an aggregate of approximately 4 million square feet of floor space. Major production sites include facilities in the United Kingdom, France, Ireland, Spain, Italy, Brazil, and Mexico. We lease production and warehouse facilities in Puerto Rico and several countries outside the United States.

Our research and development facilities in the United States consist of approximately 4.6 million square feet and are located primarily in Indianapolis and Greenfield, Indiana. Our major research and development facilities abroad are located in Belgium, United Kingdom, Germany, Canada, and Spain and contain an aggregate of approximately 700,000 square feet.

We believe that none of our properties is subject to any encumbrance, easement, or other restriction that would detract materially from its value or impair its use in the operation of the business. The buildings we own are of varying ages and in good condition.

# Item 3. Legal Proceedings

We are a party to various currently pending legal actions, government investigations, and environmental proceedings, and we anticipate that such actions could be brought against us in the future. The most significant of these matters are described below or, as noted, in Item 7,

14

**Table of Contents**

"Management's Discussion and Analysis — Legal and Regulatory Matters." While it is not possible to predict or determine the outcome of the legal actions, investigations and proceedings brought against us, we believe that, except as otherwise specifically noted in Item 7, the resolution of all such matters will not have a material adverse effect on our consolidated financial position or liquidity, but could possibly be material to our consolidated results of operations in any one accounting period.

### Legal Proceedings Described in Management's Discussion and Analysis

See Item 7, "Management's Discussion and Analysis — Legal and Regulatory Matters," for information on various legal proceedings, including but not limited to:

- The U.S. patent litigation involving Zyprexa, Evista, and Gemzar
- The civil investigation by the U.S. Attorney for the Eastern District of Pennsylvania relating to our U.S. sales, marketing, and promotional practices
- The Zyprexa product liability and related litigation, including claims brought on behalf of healthcare payors
- The suits we have filed against several of our product liability insurance carriers with respect to our coverage for the Zyprexa product liability claims

That information is incorporated into this Item by reference.

### Other Patent Litigation

During 2005, two generic pharmaceutical manufacturers, Apotex Inc. (Apotex) and Novopharm Ltd. (Novopharm) (a wholly-owned subsidiary of Teva), challenged the validity of our Zyprexa compound and method-of-use patent (expiring in 2011) in Canada. We currently anticipate a decision from the Canadian Federal Patent Court by January 2007 in the Apotex case and by September 2007 in the Novopharm case. The generic companies allege that our patent is invalid, obtained by fraud, or irrelevant. In May 2004, Egis-Gyogyszergyar, a generic pharmaceutical manufacturer, challenged the validity of our Zyprexa compound and method-of-use patent (expiring in 2011) in Germany. We currently anticipate a decision from the German Patent Court in 2006 or 2007. In addition to our patents, we have data package exclusivity in Germany through September 2006. We have received challenges to Zyprexa patents in a number of other countries as well, including Spain, China, Russia, and several Eastern European countries. We are vigorously contesting the various legal challenges to our Zyprexa patents. We cannot predict or determine the outcome of this litigation.

In October 2002, Pfizer Inc. filed a lawsuit in the United States District Court in Delaware against us, Lilly ICOS LLC, and ICOS Corporation alleging that the proposed marketing of Cialis for erectile dysfunction would infringe its newly issued method-of-use patent. In September 2003, the U.S. Patent and Trademark Office, on its own initiative, ordered that Pfizer's patent be reexamined. The Delaware suit has been stayed pending the outcome of the reexamination. In the European Union, the Technical Board of Appeal of the European Patent Office revoked Pfizer's method-of-use patent in its entirety in February 2005. The U.K. Court of Appeal has also held the U.K. counterpart to this patent invalid. Litigation relating to the corresponding patent is also pending in Australia, Brazil, Canada, Mexico, New Zealand, and South Africa. We intend to vigorously defend this litigation and expect to prevail. However, it is not possible to predict or determine the outcome of this litigation .

Table of Contents

### Other Product Liability Litigation

We are currently a defendant in a variety of product liability lawsuits in the United States involving primarily Zyprexa, diethylstilbestrol ("DES") and thimerosal.

In approximately 125 U.S. actions involving approximately 200 claimants, plaintiffs seek to recover damages on behalf of children or grandchildren of women who were prescribed DES during pregnancy.

We have been named as a defendant in approximately 340 actions in the U.S., involving approximately 1,020 claimants, brought in various state courts and federal district courts on behalf of children with autism or other neurological disorders who received childhood vaccines (manufactured by other companies) that contained thimerosal, a generic preservative used in certain vaccines in the U.S. beginning in the 1930s. We purchased patents and conducted research pertaining to thimerosal in the 1920s. We have been named in the suits even though we discontinued manufacturing the raw material in 1974 and discontinued selling it in the United States to vaccine manufacturers in 1992. The lawsuits typically name the vaccine manufacturers as well as Lilly and other distributors of thimerosal, and allege that the children's exposure to thimerosal-containing vaccines caused their autism or other neurological disorders. We strongly deny any liability in these cases. There is no credible scientific evidence establishing a causal relationship between thimerosal-containing vaccines and autism or other neurological disorders. In addition, we believe the majority of the cases should not be prosecuted in the courts in which they have been brought because the underlying claims are subject to the National Childhood Vaccine Injury Act of 1986. Implemented in 1988, the Act established a mandatory, federally administered no-fault claims process for individuals who allege that they were harmed by the administration of childhood vaccines. Under the Act, claims must first be brought before the U.S. Court of Claims for an award determination under the compensation guidelines established pursuant to the Act. Claimants who are unsatisfied with their awards under the Act may reject the award and seek traditional judicial remedies.

### Other Marketing Practices Investigations

In 2002, 2003, and 2004, we received grand jury subpoenas from the Office of Consumer Litigation, Department of Justice, related to our marketing and promotional practices and physician communications with respect to Evista. In the fourth quarter of 2004 we recorded a provision for $36.0 million in connection with the matter. In December 2005, we reached a settlement of the matter with the government, which was subsequently approved by the U.S. District Court for the Southern District of Indiana in February 2006. As part of the settlement, we agreed to plead guilty to one misdemeanor violation of the Food, Drug, and Cosmetic Act. The plea is for the off-label promotion of Evista during 1998. The government did not charge the company with any unlawful intent, nor do we acknowledge any such intent. In connection with the overall settlement, we paid a total of $36.0 million. In addition, as part of the settlement, a civil consent decree requires us to continue to have a compliance program and to undertake a set of defined corporate integrity obligations related to Evista for five years.

In August 2003, we received notice that the staff of the SEC is conducting an investigation into the compliance by Polish subsidiaries of certain pharmaceutical companies, including Lilly, with the U.S. Foreign Corrupt Practices Act of 1977. The staff has issued subpoenas to us requesting production of documents related to the investigation. We are cooperating with the SEC in responding to the investigation.

Table of Contents

**Other Matters**

In August 2005, we received a civil subpoena from office of the Attorney General of Connecticut for production of documents related to Healthcare Research & Development Institute LLC, an organization of executives of hospitals, healthcare systems, and other companies in the healthcare field, of which we are a corporate member. We are cooperating in responding to the subpoena.

In October 2005, we received a subpoena from the U.S. Attorney's office for the District of Massachusetts for the production of documents relating to our business relationship with a long-term care pharmacy organization concerning Actos, Humalog, Humulin, and Zyprexa. We are cooperating in responding to the subpoena.

Between 2003 and 2005, various counties in New York sued us and many other pharmaceutical manufacturers, claiming in general that as a result of alleged improprieties by the manufacturers in the calculation and reporting of average wholesale prices for purposes of Medicaid reimbursement, the counties overpaid their portion of the cost of pharmaceuticals. The suits seek monetary and other relief, including civil penalties and treble damages. The suits have been transferred to the U.S. District Court for the District of Massachusetts for pretrial proceedings. The suits are in the earliest stages. Similar suits were filed against us and many other manufacturers by the states of Alabama and Mississippi. In December 2005, Alabama voluntarily dismissed its case against us. The Mississippi case, pending in state court in Hinds County, is in the earliest stages.

During 2004 we, along with several other pharmaceutical companies, were named in one consolidated case in Minnesota federal court brought on behalf of consumers alleging that the conduct of pharmaceutical companies in preventing commercial importation of prescription drugs from outside the United States violated antitrust laws and one case in California state court brought by several pharmacies in which plaintiffs' claims are less specifically stated, but are substantially similar to the claims asserted in Minnesota. Both cases seek restitution for alleged overpayments for pharmaceuticals and an injunction against the allegedly violative conduct. The federal district court in the Minnesota case has dismissed the federal claims and ruled that the state claims must be brought in separate state court actions. Plaintiffs have appealed that decision to the Eighth Circuit Court of Appeals. The California case is currently in discovery.

Under the Comprehensive Environmental Response, Compensation, and Liability Act, commonly known as Superfund, we have been designated as one of several potentially responsible parties with respect to the cleanup of fewer than 10 sites. Under Superfund, each responsible party may be jointly and severally liable for the entire amount of the cleanup.

We are also a defendant in other litigation and investigations, including product liability and patent suits, of a character we regard as normal to our business.

# Item 4.     Submission of Matters to a Vote of Security Holders

During the fourth quarter of 2005, no matters were submitted to a vote of security holders.

Table of Contents

## Legal and Governmental Matters

Certain generic manufacturers have challenged our U.S. compound patent for Zyprexa and are seeking permission to market generic versions of Zyprexa prior to its patent expiration in 2011. On April 14, 2005, the U.S. District Court in Indianapolis ruled in our favor on all counts, upholding our patents. The decision has been appealed.

In 2005, we entered into an agreement with plaintiffs' attorneys involved in certain U.S. Zyprexa product liability litigation to settle a majority of the claims against us relating to the medication. We established a fund of $690 million for the claimants who agree to settle their claims. Additionally, we paid $10 million to cover administration of the settlement. As a result of our product liability exposures, the substantial majority of which were related to Zyprexa, we recorded a net pretax charge of $1.07 billion in the second quarter of 2005.

In March 2004, we were notified by the U.S. Attorney's office for the Eastern District of Pennsylvania that it has commenced a civil investigation relating to our U.S. sales, marketing, and promotional practices.

In the United States, implementation of the Medicare Prescription Drug, Improvement and Modernization Act of 2003 (MMA), which provides a prescription drug benefit under the Medicare program, took effect January 1, 2006. While it is difficult to predict the business impact of this legislation, we currently anticipate a modest short-term increase in sales. However, in the long term there is additional risk of increased pricing pressures. While the MMA prohibits the Secretary of Health and Human Services (HHS) from directly negotiating prescription drug prices with manufacturers, we expect continued challenges to that prohibition over the next several years. Also, the MMA retains the authority of the Secretary of HHS to prohibit the importation of prescription drugs, but we expect Congress to consider several measures that could remove that authority and allow for the importation of products into the U.S. regardless of their safety or cost. If adopted, such legislation would likely have a negative effect on our U.S. sales. We believe there is some chance that the new and expanded prescription drug coverage for seniors under the MMA will alleviate the need for a federal importation scheme.

As a result of the passage of the MMA, aged and disabled patients jointly eligible for Medicare and Medicaid began receiving their prescription drug benefits through the Medicare program, instead of Medicaid, on January 1, 2006. This may relieve some state budget pressures but is unlikely to result in reduced pricing pressures at the state level. A majority of states have begun to implement supplemental rebates and restricted formularies in their Medicaid programs, and these programs are expected to continue in the post-MMA environment. Several states are also attempting to extend discounted Medicaid prices to non-Medicaid patients. Additionally, notwithstanding the federal law prohibiting drug importation, approximately a dozen states have implemented importation schemes for their citizens, usually involving a website that links patients to selected Canadian pharmacies. One state has such a program for its state employees. As a result, we expect pressures on pharmaceutical pricing to continue.

International operations are also generally subject to extensive price and market regulations, and there are many proposals for additional cost-containment measures, including proposals that would directly or indirectly impose additional price controls or reduce the value of our intellectual property protection.

21

Table of Contents

## Financial Expectations for 2006

For the full year of 2006, we expect earnings per share to be in the range of $3.10 to $3.20. We expect sales to grow 7 to 9 percent and gross margins as a percent of sales to improve modestly compared with 2005. In addition, we expect operating expenses to grow in the mid-single digits in the aggregate, with marketing and administrative expenses accelerating while research and development expense growth moderates somewhat. However, we will continue to be among the industry leaders in terms of research and development investment as a percent of sales. We also expect other income, net of interest expense, to contribute approximately $175 million to $275 million; this ongoing net contribution is expected to be driven primarily by net interest income, Lilly ICOS joint venture after-tax profit, and partnering and out-licensing of molecules. We also anticipate the effective tax rate to be approximately 21 percent.

Actual results could differ materially and will depend on, among other things, the continuing growth of our currently marketed products; developments with competitive products; the timing and scope of regulatory approvals and the success of our new product launches; asset impairments, restructurings, and acquisitions of compounds under development resulting in acquired in-process research and development charges; foreign exchange rates; wholesaler inventory changes; other regulatory developments, litigation, and government investigations; the outcome of the Zyprexa patent appeal; and the impact of governmental actions regarding pricing, importation, and reimbursement for pharmaceuticals. We undertake no duty to update these forward-looking statements.

## Legal and Regulatory Matters

Three generic pharmaceutical manufacturers, Zenith Goldline Pharmaceuticals, Inc. (Zenith), Dr. Reddy's Laboratories, Ltd. (Reddy), and Teva Pharmaceuticals (Teva), submitted abbreviated new drug applications (ANDAs) seeking permission to market generic versions of Zyprexa in various dosage forms several years prior to the expiration of our U.S. patents for the product. The generic companies alleged that our patents are invalid, unenforceable, or not infringed. We filed suit against the three companies in the U.S. District Court for the Southern District of Indiana, seeking a ruling that the challenges to our compound patent (expiring in 2011) are without merit. The cases were consolidated, and on April 14, 2005, the district court upheld our 2011 U.S. patent on Zyprexa. In the case of Eli Lilly and Company v. Zenith Goldline Pharmaceuticals et al., the court ruled in our favor on all counts, including the patent doctrines of obviousness, double patenting, inequitable conduct, novelty, and public use. The decision has been appealed. We are confident, and the trial court confirmed, that the generic manufacturers' claims are without merit, and we expect to prevail in this litigation. However, it is not possible to predict or determine the outcome of this litigation and, accordingly, we can provide no assurance that we will prevail on appeal. An unfavorable outcome would have a material adverse impact on our consolidated results of operations, liquidity, and financial position.

In 2002, Barr Laboratories, Inc. (Barr), submitted an ANDA with the FDA seeking permission to market a generic version of Evista (raloxifene) several years prior to the expiration of our U.S. patents covering the product, alleging that the patents are invalid or not infringed. In November 2002, we filed suit against Barr in the U.S. District Court for the Southern District of Indiana, seeking a ruling that Barr's challenges to our patents claiming the methods of use and pharmaceutical form (expiring from 2012 to 2017) are without merit. Barr has also asserted that the method of use patents are unenforceable. The U.S. Patent and Trademark Office issued to us two new patents (expiring in 2017) directed to pharmaceutical compositions containing raloxifene and a

37

**Table of Contents**

method for preventing postmenopausal osteoporosis and a third (expiring in 2012) directed to methods of inhibiting postmenopausal bone loss by administering a single daily oral dose of raloxifene. These patents have been listed in the FDA's *Orange Book*. Barr has challenged these patents, alleging that each is invalid, unenforceable, or will not be infringed. These patents have been added to the pending suit. The suit is in discovery. No trial date has been set at this time. While we believe that Barr's claims are without merit and we expect to prevail, it is not possible to predict or determine the outcome of the litigation. Therefore, we can provide no assurance that we will prevail. An unfavorable outcome could have a material adverse impact on our consolidated results of operations, liquidity, and financial position.

In January 2006, we were notified that Sicor Pharmaceuticals, Inc. (Sicor), a subsidiary of Teva, submitted an ANDA with the FDA seeking permission to market a generic version of Gemzar several years prior to the expiration of two U.S. patents covering the product. Sicor alleged that both U.S. patents are invalid. In February, we filed suit against Sicor in the U.S. District Court for the Southern District of Indiana, seeking a ruling that Sicor's challenges to our patents claiming the compound (expiring in 2010) and the methods of use (expiring in 2012) are without merit. While we believe that Sicor's claims are without merit and we expect to prevail, it is not possible to predict or determine the outcome of the litigation. Therefore, we can provide no assurance that we will prevail. An unfavorable outcome could have a material adverse impact on our consolidated results of operations.

In July 2002, we received the first of several grand jury subpoenas for documents from the Office of Consumer Litigation, U.S. Department of Justice, related to our marketing and promotional practices and physician communications with respect to Evista. We reached a settlement with the U.S. Department of Justice in the fourth quarter of 2005, which was subsequently approved by the U.S. District Court for the Southern District of Indiana in February 2006. As part of the settlement, Lilly pleaded guilty to one misdemeanor violation of the Food, Drug, and Cosmetic Act. The plea is for the off-label promotion of Evista during 1998. The government did not, however, charge the company with any unlawful intent, nor do we acknowledge any such intent. In connection with the overall settlement, we agreed to pay a total of $36 million. As previously reported, Lilly took a charge in the fourth quarter of 2004 in connection with this investigation. The 2004 charge was sufficient to cover this settlement payment; consequently, no further charge will be necessary.

In March 2004, the office of the U.S. Attorney for the Eastern District of Pennsylvania advised us that it has commenced a civil investigation related to our U.S. marketing and promotional practices, including our communications with physicians and remuneration of physician consultants and advisors, with respect to Zyprexa, Prozac, and Prozac Weekly™. In October 2005, the U.S. Attorney's office advised that it is also conducting an inquiry regarding certain rebate agreements we entered into with a pharmacy benefit manager covering Axid, Evista, Humalog, Humulin, Prozac, and Zyprexa. The inquiry includes a review of Lilly's Medicaid best price reporting related to the product sales covered by the rebate agreements. We are cooperating with the U.S. Attorney in these investigations, including providing a broad range of documents and information relating to the investigations. In June 2005, we received a subpoena from the office of the Attorney General, Medicaid Fraud Control Unit, of the State of Florida, seeking production of documents relating to sales of Zyprexa and our marketing and promotional practices with respect to Zyprexa. It is possible that other Lilly products could become subject to investigation and that the outcome of these matters could include criminal charges and fines, penalties, or other monetary or nonmonetary remedies. We cannot predict or determine the outcome of these matters or reasonably estimate the amount or range of amounts of any fines or penalties that might result from an adverse outcome. It is possible, however, that an adverse outcome could have a material adverse impact on

38

**Table of Contents**

our consolidated results of operations, liquidity, and financial position. We have implemented and continue to review and enhance a broadly based compliance program that includes comprehensive compliance-related activities designed to ensure that our marketing and promotional practices, physician communications, remuneration of health care professionals, managed care arrangements, and Medicaid best price reporting comply with applicable laws and regulations.

We have been named as a defendant in a large number of Zyprexa product liability lawsuits in the United States and have been notified of several thousand claims of individuals who have not filed suit. The lawsuits and unfiled claims (together the "claims") allege a variety of injuries from the use of Zyprexa, with the majority alleging that the product caused or contributed to diabetes or high blood-glucose levels. The claims seek substantial compensatory and punitive damages and typically accuse us of inadequately testing for and warning about side effects of Zyprexa. Many of the claims also allege that we improperly promoted the drug. Almost all of the federal lawsuits are part of a Multi-District Litigation (MDL) proceeding before The Honorable Jack Weinstein in the Federal District Court for the Eastern District of New York (MDL No. 1596). The MDL includes three lawsuits requesting certification of class actions on behalf of those who allegedly suffered injuries from the administration of Zyprexa. We have entered into agreements with various plaintiffs' counsel halting the running of the statutes of limitation (tolling agreements) with respect to a large number of claimants who do not have lawsuits on file.

In June 2005, we entered into an agreement in principle (followed by a definitive master settlement agreement in September 2005) with a group of plaintiffs' attorneys involved in U.S. Zyprexa product liability litigation to settle a majority of the claims. The agreement covers more than 8,000 claimants, including a large number of previously filed lawsuits (including the three purported class actions), tolled claims, and other informally asserted claims. We established a fund of $690 million for the claimants to settle their claims, and $10 million to cover administration of the settlement. The settlement fund is being overseen and distributed by claims administrators appointed by the court. The agreement and the distribution of funds to participating claimants are conditioned upon, among other things, our obtaining full releases from no fewer than 7,193 claimants.

Following this settlement, the remaining U.S. Zyprexa product liability claims include approximately 150 lawsuits in the U.S. covering 465 claimants, and approximately 825 tolled claims. In addition, we have been informally advised of a number of additional potential U.S. claims, but to date have received no substantiation of the claims. Also, in early 2005, we were served with five lawsuits seeking class action status in Canada on behalf of patients who took Zyprexa. The allegations in the Canadian actions are similar to those in the litigation pending in the United States. We are prepared to continue our vigorous defense of Zyprexa in all remaining cases.

In 2005, two lawsuits were filed in the Eastern District of New York purporting to be nationwide class actions on behalf of all consumers and third party payors, excluding governmental entities, which have made or will make payments on account of their members or insured patients being prescribed Zyprexa. These actions have now been consolidated into a single lawsuit, which is brought under certain state consumer protection statutes, the federal civil RICO statute, and common law theories, seeking a refund of the cost of Zyprexa, treble damages, punitive damages, and attorneys' fees. In addition, in 2006 a similar lawsuit was filed in the Eastern District of New York on similar grounds. As with the product liability suits, these lawsuits allege that we inadequately tested for and warned about side effects of Zyprexa and improperly promoted the drug.

In December 2004, we were served with two lawsuits brought in state court in Louisiana on behalf of the Louisiana Department of Health and Hospitals, alleging that Zyprexa caused or contributed

39

**Table of Contents**

to diabetes or high blood-glucose levels, and that we improperly promoted the drug. These cases have been removed to federal court and are now part of the MDL proceedings in the Eastern District of New York. In these actions, the Department of Health and Hospitals seeks to recover the costs it paid for Zyprexa through Medicaid and other drug-benefit programs, as well as the costs the department alleges it has incurred and will incur to treat Zyprexa-related illnesses.

In connection with the Zyprexa product liability claims, certain of our insurance carriers have raised defenses to their liability under the policies and to date have failed to reimburse us for claim-related costs despite demand from the first-layer carriers for payment. However, in our opinion, the defenses identified to date appear to lack substance. In March 2005, we filed suit against several of the carriers in state court in Indiana to obtain reimbursement of costs related to the Zyprexa product liability litigation. The matter has been removed to the federal court in Indianapolis. Several carriers have asserted defenses to their liability, and some carriers are seeking rescission of the coverage. While we believe our position is meritorious, there can be no assurance that we will prevail.

In addition, we have been named as a defendant in numerous other product liability lawsuits involving primarily diethylstilbestrol (DES) and thimerosal.

With respect to the product liability claims currently asserted against us, we have accrued for our estimated exposures to the extent they are both probable and estimable based on the information available to us. In addition, we have accrued for certain product liability claims incurred but not filed to the extent we can formulate a reasonable estimate of their costs. We estimate these expenses based primarily on historical claims experience and data regarding product usage. Legal defense costs expected to be incurred in connection with significant product liability loss contingencies are accrued when probable and reasonably estimable. A portion of the costs associated with defending and disposing of these suits is covered by insurance. We record receivables for insurance-related recoveries when it is probable they will be realized. These receivables are classified as a reduction of the litigation charges on the statement of income. We estimate insurance recoverables based on existing deductibles, coverage limits, our assessment of any defenses to coverage that might be raised by the carriers, and the existing and projected future level of insolvencies among the insurance carriers.

In the second quarter of 2005, we recorded a net pre-tax charge of $1.07 billion for product liability matters, which includes the following:

- The $700 million Zyprexa settlement and administration fee;
- Reserves for product liability exposures and defense costs regarding currently known and expected claims to the extent we can formulate a reasonable estimate of the probable number and cost of the claims. A substantial majority of these exposures and costs relate to current and expected Zyprexa claims not included in the settlement. We have estimated these charges based primarily on historical claims experience, data regarding product usage, and our historical product liability defense cost experience.

The $1.07 billion net charge took into account our estimated recoveries from our insurance coverage related to these matters. The after-tax impact of this net charge was $.90 per share. The $700 million for the Zyprexa settlement was paid during 2005, while the cash related to the other reserves for product liability exposures and defense costs is expected to be paid out over the next several years. The timing of our insurance recoveries is uncertain.

We cannot predict with certainty the additional number of lawsuits and claims that may be asserted. In addition, although we believe it is probable, there can be no assurance that the Zyprexa

40

**Table of Contents**

settlement described above will be concluded. The ultimate resolution of Zyprexa product liability and related litigation could have a material adverse impact on our consolidated results of operations, liquidity, and financial position.

We are subject to a substantial number of product liability claims, and because of the nature of pharmaceutical products, it is possible that we could become subject to large numbers of product liability claims for other products in the future. We have experienced difficulties in obtaining product liability insurance due to a very restrictive insurance market, and therefore will be largely self-insured for future product liability losses. In addition, there is no assurance that we will be able to fully collect from our insurance carriers on past claims.

While it is not possible to predict or determine the outcome of the patent, product liability, or other legal actions brought against us, we believe that, except as noted above, the resolution of all such matters will not have a material adverse effect on our consolidated financial position or liquidity but could possibly be material to the consolidated results of operations in any one accounting period.

# Item 7A.    Quantitative and Qualitative Disclosures About Market Risk

You can find quantitative and qualitative disclosures about market risk (*e.g.*, interest rate risk) in Item 7 at "Financial Condition" at pp. 31-32. That information is incorporated in this report by reference.