# EXHIBIT 4

United States
Securities and Exchange Commission
Washington, D.C. 20549

# Form 10-K

Annual report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934
for the fiscal year ended December 31, 2006

Commission file number 001-06351

# Eli Lilly and Company

An Indiana corporation        I.R.S. employer identification no. 35-0470950

Lilly Corporate Center, Indianapolis, Indiana 46285

(317) 276-2000

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange On Which Registered |
|---|---|
| Common Stock(no par value) | New York Stock Exchange |
| Preferred Stock Purchase Rights | New York Stock Exchange |
| 6.57% Notes Due January 1, 2016 | New York Stock Exchange |
| 7-1/8% Notes Due June 1, 2025 | New York Stock Exchange |
| 6.77% Notes Due January 1, 2036 | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑ No ☐

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐ No ☑

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months, and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in the definitive proxy statement incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer or a non-accelerated filer.
☑ Large accelerated filer    ☐ Accelerated filer    ☐ Non-accelerated filer

Indicate by check mark whether the Registrant is a shell company as defined in Rule 12b-2 of the Act:
Yes ☐ No ☑

Aggregate market value of the common equity held by non-affiliates computed by reference to the price at which the common equity was last sold as of the last business day of the Registrant's most recently completed second fiscal quarter (Common Stock): approximately $54,806,400,000

Number of shares of common stock outstanding as of February 15, 2007: 1,134,034,234

Portions of the Registrant's Proxy Statement to be filed on or about March 5, 2007 have been incorporated by reference into Part III of this report.

## TABLE OF CONTENTS

Part I
Item 1. Business
Item 1A: Risk Factors; Cautionary Statement Regarding Forward Looking Statements
Item 1B. Unresolved Staff Comments
Item 2. Properties
Item 3. Legal Proceedings
Item 4. Submission of Matters to a Vote of Security Holders
Part II
Item 5. Market for the Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities
Item 6. Selected Financial Data
Item 7. Management's Discussion and Analysis of Results of Operations and Financial Condition
Item 7A. Quantitative and Qualitative Disclosures About Market Risk
Item 8. Financial Statements and Supplementary Data
Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure
Item 9A. Controls and Procedures
Item 9B. Other Information
Part III
Item 10. Directors, Executive Officers and Corporate Governance
Item 11. Executive Compensation
Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters
Item 13. Certain Relationships and Related Transactions, and Director Independence
Item 14. Principal Accountant Fees and Services
Item 15. Exhibits and Financial Statement Schedules

# Part I

## Item 1. Business

Eli Lilly and Company (the "Company" or "Registrant", which may be referred to as "we", "us", or "our") was incorporated in 1901 in Indiana to succeed to the drug manufacturing business founded in Indianapolis, Indiana, in 1876 by Colonel Eli Lilly. We discover, develop, manufacture, and sell products in one significant business segment — pharmaceutical products. We also have an animal health business segment, whose operations are not material to our financial statements. We manufacture and distribute our products through owned or leased facilities in the United States, Puerto Rico, and 25 other countries. Our products are sold in approximately 140 countries.

Most of the products we sell today were discovered or developed by our own scientists, and our success depends to a great extent on our ability to continue to discover and develop innovative new pharmaceutical products. We direct our research efforts primarily toward the search for products to prevent and treat human diseases. We also conduct research to find products to treat diseases in animals and to increase the efficiency of animal food production.

**Products**

income generation in these jurisdictions could lead to the reversal of these valuation allowances and a reduction of income tax expense.

We believe that our estimates for the valuation allowances against the deferred tax assets are appropriate based on current facts and circumstances. A 5 percent change in the valuation allowance would result in a change in net income of approximately $25 million.

### FINANCIAL EXPECTATIONS FOR 2007

For the full year of 2007, we expect earnings per share to be in the range of $2.89 to $2.99. This guidance includes the estimated $.10 per share dilutive impact of the ICOS acquisition related to the incremental interest expense on debt used to finance the acquisition, the amortization of ICOS intangibles and other integration costs. A disproportionate amount of this dilution is expected to be incurred in the first half of the year. This guidance also includes the IPR&D charges related to the ICOS acquisition and the in-licensing of a diabetes compound from OSI, together estimated to be a total of $.29 per share as discussed in Note 3, as well as additional restructuring and other special charges as discussed in Note 4, estimated to be $.07 per share. We expect sales to grow in the high single or low double digits, impacted favorably by the inclusion of all Cialis revenue subsequent to the acquisition. Gross margins as a percent of sales are expected to improve slightly compared with 2006. In addition, we expect operating expenses to grow in the low double digits, driven primarily by the inclusion of all Cialis operating expenses subsequent to the acquisition and increased marketing and selling expenses in support of Cymbalta, Zyprexa, and the diabetes care franchise, as well as ongoing investment in research and development that will continue to place Lilly among the industry leaders in terms of research and development as a percent of sales. We also expect other income — net to contribute less than $100 million, a reduction from 2006 due to the removal of the Lilly ICOS joint venture after-tax profit. Other income will primarily include net interest income and income from the partnering and out-licensing of molecules. In terms of cash flow, we expect a continuation of strong cash flow trends in 2007, with capital expenditures of approximately $1.1 billion.

Actual results could differ materially and will depend on, among other things, the continuing growth of our currently marketed products; developments with competitive products; the timing and scope of regulatory approvals and the success of our new product launches; asset impairments, restructurings, and acquisitions of compounds under development resulting in acquired in-process research and development charges; foreign exchange rates; wholesaler inventory changes; other regulatory developments, litigation and government investigations; and the impact of governmental actions regarding pricing, importation, and reimbursement for pharmaceuticals. We undertake no duty to update these forward-looking statements.

### LEGAL AND REGULATORY MATTERS

We are a party to various legal actions and government investigations. The most significant of these are described below. While it is not possible to predict or determine the outcome of these matters, we believe that, except as specifically noted below, the resolution of all such matters will not have a material adverse effect on our consolidated financial position or liquidity, but could possibly be material to our consolidated results of operations in any one accounting period.

**Patent Litigation**

We are engaged in the following patent litigation matters brought pursuant to procedures set out in the Hatch-Waxman Act (the Drug Price Competition and Patent Term Restoration Act of 1984):

- Dr. Reddy's Laboratories, Ltd. (Reddy), Teva Pharmaceuticals, and Zenith Goldline Pharmaceuticals, Inc., which was subsequently acquired by Teva Pharmaceuticals (together, Teva), each submitted Abbreviated New Drug Applications (ANDAs) seeking permission to market generic versions of Zyprexa prior to the expiration of our relevant U.S. patent (expiring in 2011) and alleging that this patent was invalid or not enforceable. We filed lawsuits against these companies in the U.S. District Court for the Southern District of Indiana, seeking a ruling that the patent is valid, enforceable and being infringed. The district court ruled in our favor on all counts on April 14, 2005, and on December 26, 2006, that ruling was upheld by the Court

-34-

of Appeals for the Federal Circuit. Reddy and Teva are seeking a review of that decision. We are confident Reddy's and Teva's claims are without merit and we expect to prevail. An unfavorable outcome would have a material adverse impact on our consolidated results of operations, liquidity, and financial position.

- Barr Laboratories, Inc. (Barr), submitted an ANDA in 2002 seeking permission to market a generic version of Evista prior to the expiration of our relevant U.S. patents (expiring in 2012-2017) and alleging that these patents are invalid, not enforceable, or not infringed. In November 2002, we filed a lawsuit against Barr in the U.S. District Court for the Southern District of Indiana, seeking a ruling that these patents are valid, enforceable, and being infringed by Barr. Teva has also submitted an ANDA seeking permission to market a generic version of Evista. In June 2006, we filed a lawsuit against Teva in the U.S. District Court for the Southern District of Indiana, seeking a ruling that our relevant U.S. patents are valid, enforceable, and being infringed by Teva. No trial date has been set in either case. We believe Barr's and Teva's claims are without merit and we expect to prevail. However, it is not possible to predict or determine the outcome of this litigation, and accordingly, we can provide no assurance that we will prevail. An unfavorable outcome could have a material adverse impact on our consolidated results of operations, liquidity, and financial position.

- Sicor Pharmaceuticals, Inc. (Sicor), a subsidiary of Teva, submitted ANDAs in November 2005 seeking permission to market generic versions of Gemzar prior to the expiration of our relevant U.S. patents (expiring in 2010 and 2013), and alleging that these patents are invalid. In February 2006, we filed a lawsuit against Sicor in the U.S. District Court for the Southern District of Indiana, seeking a ruling that these patents are valid and are being infringed by Sicor. In response to our lawsuit, Sicor filed a declaratory judgment action in the U.S. District Court for the Central District of California. Sicor also moved to dismiss our lawsuit in Indiana, asserting the Indiana court lacks jurisdiction. The California action has been dismissed. In September 2006, we received notice that Mayne Pharma (USA) Inc. (Mayne) filed a similar ANDA for Gemzar. In October 2006, we filed a lawsuit against Mayne in the Southern District of Indiana in response to the ANDA filing. In response to our lawsuit, Mayne filed a motion to our lawsuit, asserting the Indiana court lacks jurisdiction. In October 2006, we received notice that Sun Pharmaceutical Industries Inc. (Sun) filed an ANDA for Gemzar, alleging that the 2013 patent is invalid. In December 2006, we filed a lawsuit against Sun in the Southern District of Indiana in response to Sun's ANDA filing. We expect to prevail in litigation involving our Gemzar patents and believe that claims made by these generic companies that our patents are not valid are without merit. However, it is not possible to predict or determine the outcome of this litigation, and accordingly, we can provide no assurance that we will prevail. An unfavorable outcome could have a material adverse impact on our consolidated results of operations, liquidity, and financial position.

In June 2002, we were sued by Ariad Pharmaceuticals, Inc., the Massachusetts Institute of Technology, the Whitehead Institute for Biomedical Research and the President and Fellows of Harvard College in the U.S. District Court for the District of Massachusetts alleging that sales of two of our products, Xigris and Evista, were inducing the infringement of a patent related to the discovery of a natural cell signaling phenomenon in the human body, and seeking royalties on past and future sales of these products. In June 2005, the United States Patent and Trademark Office commenced a re-examination of the patent in order to consider certain issues raised by us relating to the validity of the patent. On May 4, 2006, a jury in Boston issued an initial decision in the case that Xigris and Evista sales infringe the patent. The jury awarded the plaintiffs approximately $65 million in damages, calculated by applying a 2.3 percent royalty to all U.S. sales of Xigris and Evista from the date of issuance of the patent through the date of trial. We are seeking to have the jury verdict overturned by the trial court judge, and if unsuccessful, will appeal the decision to the Court of Appeals for the Federal Circuit. In addition, a separate bench trial with the U.S. District Court of Massachusetts was held the week of August 7, 2006, on our contention that the patent is unenforceable and impermissibly covers natural processes. No decision has been rendered. We believe that these allegations are without legal merit, that we will ultimately prevail on these issues and therefore that the likelihood of any monetary damages is remote.

-35-

**Government Investigations**

In March 2004, the office of the U.S. Attorney for the Eastern District of Pennsylvania advised us that it had commenced a civil investigation related to our U.S. marketing and promotional practices, including our communications with physicians and remuneration of physician consultants and advisors, with respect to Zyprexa, Prozac, and Prozac Weekly™. In October 2005, the U.S. Attorney's Office advised that it is also conducting an inquiry regarding certain rebate agreements we entered into with a pharmacy benefit manager covering Axid®, Evista, Humalog, Humulin, Prozac, and Zyprexa. The inquiry includes a review of Lilly's Medicaid best price reporting related to the product sales covered by the rebate agreements. We are cooperating with the U.S. Attorney in these investigations, including providing a broad range of documents and information relating to the investigations. In June 2005, we received a subpoena from the office of the Attorney General, Medicaid Fraud Control Unit, of the State of Florida, seeking production of documents relating to sales of Zyprexa and our marketing and promotional practices with respect to Zyprexa. In September 2006, we received a subpoena from the California Attorney General's office seeking production of documents related to our efforts to obtain and maintain Zyprexa's status on California's formulary, marketing and promotional practices with respect to Zyprexa, and remuneration of health care providers. Beginning in August 2006, we have received civil investigative demands or subpoenas from the attorneys general of a number of states. Most of these requests are now part of a multistate investigative effort being coordinated by an executive committee of attorneys general. We are aware that 26 states are participating in this joint effort, and we anticipate that additional states will join the investigation. These attorneys general are seeking a broad range of Zyprexa documents, including documents relating to sales, marketing and promotional practices, and remuneration of health care providers. It is possible that other Lilly products could become subject to investigation and that the outcome of these matters could include criminal charges and fines, penalties, or other monetary or nonmonetary remedies. We cannot predict or determine the outcome of these matters or reasonably estimate the amount or range of amounts of any fines or penalties that might result from an adverse outcome. It is possible, however, that an adverse outcome could have a material adverse impact on our consolidated results of operations, liquidity, and financial position. We have implemented and continue to review and enhance a broadly based compliance program that includes comprehensive compliance-related activities designed to ensure that our marketing and promotional practices, physician communications, remuneration of health care professionals, managed care arrangements, and Medicaid best price reporting comply with applicable laws and regulations.

**Product Liability and Related Litigation**

We have been named as a defendant in a large number of Zyprexa product liability lawsuits in the United States and have been notified of many other claims of individuals who have not filed suit. The lawsuits and unfiled claims (together the "claims") allege a variety of injuries from the use of Zyprexa, with the majority alleging that the product caused or contributed to diabetes or high blood-glucose levels. The claims seek substantial compensatory and punitive damages and typically accuse us of inadequately testing for and warning about side effects of Zyprexa. Many of the claims also allege that we improperly promoted the drug. Almost all of the federal lawsuits are part of a Multi-District Litigation (MDL) proceeding before The Honorable Jack Weinstein in the Federal District Court for the Eastern District of New York (MDL No. 1596).

Since June 2005, we have entered into agreements with various claimants' attorneys involved in U.S. Zyprexa product liability litigation to settle a substantial majority of the claims. The agreements cover a total of approximately 28,500 claimants, including a large number of previously filed lawsuits and other asserted claims. The two primary settlements were as follows:

- In June 2005, we reached an agreement in principle (and in September 2005 a final agreement) to settle more than 8,000 claims for $690.0 million plus $10.0 million to cover administration of the settlement. That settlement is being administered by special settlement masters appointed by Judge Weinstein.

- In January 2007, we reached agreements with a number of plaintiffs' attorneys to settle more than 18,000 claims for approximately $500 million.

The 2005 settlement totaling $700.0 million was paid during 2005. The January 2007 settlements were recorded in other current liabilities in our December 31, 2006 consolidated balance sheet and will be paid in the first quarter of 2007.

The U.S. Zyprexa product liability claims not subject to these agreements include approximately 340 lawsuits in the U.S. covering approximately 900 claimants and an additional 400 claims of which we are aware. In addition, we have been served with a lawsuit seeking class certification in which the members of the purported class are seeking refunds and medical monitoring. In early 2005, we were served with four lawsuits seeking class action status in Canada on behalf of patients who took Zyprexa. One of these four lawsuits has been certified for residents of Quebec. The allegations in the Canadian actions are similar to those in the litigation pending in the U.S.

We are prepared to continue our vigorous defense of Zyprexa in all remaining cases. We currently anticipate that trials in seven cases in the Eastern District of New York will begin in the second quarter of 2007.

We have insurance coverage for a portion of our Zyprexa product liability claims exposure. The third party insurance carriers have raised defenses to their liability under the policies and are seeking to rescind the policies. The dispute is now the subject of litigation in the federal court in Indianapolis against certain of the carriers and in arbitration in Bermuda against other carriers. While we believe our position has merit, there can be no assurance that we will prevail.

In addition, we have been named as a defendant in numerous other product liability lawsuits involving primarily diethylstilbestrol (DES) and thimerosal. The majority of these claims are covered by insurance, subject to deductibles and coverage limits.

In the second quarter of 2005, we recorded a net pretax charge of $1.07 billion for product liability matters. The charge took into account our estimated recoveries from our insurance coverage related to these matters. The charge covered the following:

- The cost of the June 2005 Zyprexa settlements described above; and

- Reserves for product liability exposures and defense costs regarding the then-known and expected product liability claims to the extent we could formulate a reasonable estimate of the probable number and cost of the claims. A substantial majority of those exposures and costs were related to then-known and expected Zyprexa claims.

As a result of the January 2007 settlements discussed above, we incurred a pretax charge of $494.9 million in the fourth quarter of 2006. The charge covered the following:

- The cost of the January 2007 Zyprexa settlements; and

- Reserves for product liability exposures and defense costs regarding the then-known and expected Zyprexa product liability claims to the extent we could formulate a reasonable estimate of the probable number and cost of the claims.

In December 2004, we were served with two lawsuits brought in state court in Louisiana on behalf of the Louisiana Department of Health and Hospitals, alleging that Zyprexa caused or contributed to diabetes or high blood-glucose levels, and that we improperly promoted the drug. These cases have been removed to federal court and are now part of the MDL proceedings in the Eastern District of New York. In these actions, the Department of Health and Hospitals seeks to recover the costs it paid for Zyprexa through Medicaid and other drug-benefit programs, as well as the costs the department alleges it has incurred and will incur to treat Zyprexa-related illnesses. In 2006, we were served with similar lawsuits filed by the states of Alaska, West Virginia, New Mexico, and Mississippi in the courts of the respective states.

In 2005, two lawsuits were filed in the Eastern District of New York purporting to be nationwide class actions on behalf of all consumers and third-party payors, excluding governmental entities, which have made or will make payments for their members or insured patients being prescribed Zyprexa. These actions have now been consolidated into a single lawsuit, which is brought under certain state consumer protection statutes, the federal civil RICO statute, and common law theories, seeking a refund of the cost of Zyprexa, treble damages,

punitive damages, and attorneys' fees. Two additional lawsuits were filed in the Eastern District of New York in 2006 on similar grounds. As with the product liability suits, these lawsuits allege that we inadequately tested for and warned about side effects of Zyprexa and improperly promoted the drug.

We cannot predict with certainty the additional number of lawsuits and claims that may be asserted. In addition, although we believe it is probable, there can be no assurance that the January 2007 Zyprexa product liability settlements described above will be concluded. The ultimate resolution of Zyprexa product liability and related litigation could have a material adverse impact on our consolidated results of operations, liquidity, and financial position.

Because of the nature of pharmaceutical products, it is possible that we could become subject to large numbers of product liability and related claims for other products in the future. In the past few years, we have experienced difficulties in obtaining product liability insurance due to a very restrictive insurance market. Therefore, for substantially all of our currently marketed products, we have been and expect that we will continue to be largely self-insured for future product liability losses. In addition, as noted above, there is no assurance that we will be able to fully collect from our insurance carriers on past claims.

**PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 — A CAUTION CONCERNING FORWARD-LOOKING STATEMENTS**

Under the safe harbor provisions of the Private Securities Litigation Reform Act of 1995, we caution investors that any forward-looking statements or projections made by us, including those made in this document, are based on management's expectations at the time they are made, but they are subject to risks and uncertainties that may cause actual results to differ materially from those projected. Economic, competitive, governmental, technological, legal, and other factors that may affect our operations and prospects are discussed earlier in this section and our most recent report on Forms 10-Q and 10-K filed with the Securities and Exchange Commission. We undertake no duty to update forward-looking statements.

## Item 7A.　Quantitative and Qualitative Disclosures About Market Risk

You can find quantitative and qualitative disclosures about market risk (*e.g.*, interest rate risk) in Part II, Item 7 at "Review of Operations — Financial Condition." That information is incorporated in this report by reference.

-38-