# EXHIBIT 26

# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## Form 10-Q

Quarterly Report Under Section 13 or 15(d) of the
Securities Exchange Act of 1934

FOR THE QUARTER ENDED SEPTEMBER 30, 2006

COMMISSION FILE NUMBER 001-6351

# ELI LILLY AND COMPANY
(Exact name of Registrant as specified in its charter)

| INDIANA | 35-0470950 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

LILLY CORPORATE CENTER, INDIANAPOLIS, INDIANA 46285
(Address of principal executive offices)

Registrant's telephone number, including area code (317) 276-2000

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months and (2) has been subject to such filing requirements for the past 90 days.

Yes ☑   No ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer or a non-accelerated filer.

Large accelerated filer ☑   Accelerated filer ☐   Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

Yes ☐   No ☑

The number of shares of common stock outstanding as of October 20, 2006:

| Class | Number of Shares Outstanding |
|---|---|
| Common | 1,131,588,452 |

# TABLE OF CONTENTS

PART I. FINANCIAL INFORMATION
    Item 1. Financial Statements
    Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations
    Item 4. Controls and Procedures
PART II. OTHER INFORMATION
    Item 1. Legal Proceedings
    Item 2. Unregistered Sales of Equity Securities and Use of Proceeds
    Item 6. Exhibits and Reports on Form 8-K
SIGNATURES
INDEX TO EXHIBITS

PART I. FINANCIAL INFORMATION

*Item 1. Financial Statements*

## CONSOLIDATED CONDENSED STATEMENTS OF INCOME
(Unaudited)

ELI LILLY AND COMPANY AND SUBSIDIARIES

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | 2006 | 2005 | 2006 | 2005 |
|  | (Dollars in millions except per-share data) | | | |
| Net sales | $3,864.1 | $3,601.1 | $11,445.7 | $10,766.2 |
| Cost of sales | 860.4 | 845.7 | 2,527.5 | 2,576.0 |
| Research and development | 755.7 | 751.0 | 2,271.3 | 2,215.6 |
| Marketing and administrative | 1,198.2 | 1,070.9 | 3,579.0 | 3,307.4 |
| Asset impairments, restructuring, and other special charges | — | — | — | 1,073.4 |
| Other income — net | (56.0) | (85.0) | (135.1) | (229.0) |
|  | 2,758.3 | 2,582.6 | 8,242.7 | 8,943.4 |
| Income before income taxes | 1,105.8 | 1,018.5 | 3,203.0 | 1,822.8 |
| Income taxes | 232.2 | 224.1 | 672.6 | 543.8 |
| Net income | $ 873.6 | $ 794.4 | $ 2,530.4 | $ 1,279.0 |
| Earnings per share — basic | $ .80 | $ .73 | $ 2.33 | $ 1.18 |
| Earnings per share — diluted | $ .80 | $ .73 | $ 2.33 | $ 1.17 |
| Dividends paid per share | $ .40 | $ .38 | $ 1.20 | $ 1.14 |

See Notes to Consolidated Condensed Financial Statements.

Case 3:07-cv-04911-CRB   Document 10-27   Filed 09/28/2007   Page 4 of 11

We believe that cash generated from operations, along with available cash and cash equivalents, will be sufficient to fund our normal operating needs, including debt service, capital expenditures, dividends, and taxes for the remainder of 2006. We believe that amounts available through our existing commercial paper program should be adequate to fund maturities of short-term borrowings, if necessary. Various risks and uncertainties, including those discussed in the Financial Expectations for 2006 section, may affect our operating results and cash generated from operations.

## LEGAL AND REGULATORY MATTERS

We are engaged in the following patent litigation matters brought pursuant to procedures set out in the Hatch-Waxman Act (the Drug Price Competition and Patent Term Restoration Act of 1984):

- Dr. Reddy's Laboratories, Ltd. (Reddy), Teva Pharmaceuticals, and Zenith Goldline Pharmaceuticals, Inc., which was subsequently acquired by Teva Pharmaceuticals (together, Teva), each submitted abbreviated new drug applications (ANDAs) seeking permission to market generic versions of Zyprexa prior to the expiration of our relevant U.S. patent (expiring in 2011) and alleging that this patent was invalid or not enforceable. We filed lawsuits against these companies in the U.S. District Court for the Southern District of Indiana, seeking a ruling that the patent is valid, enforceable, and being infringed. The district court ruled in our favor on all counts on April 14, 2005. We are now awaiting a decision by the Court of Appeals for the Federal Circuit, which on April 6, 2006, heard Reddy's and Teva's respective appeals of this ruling. We are confident Reddy's and Teva's claims are without merit and we expect to prevail. However, it is not possible to predict or determine the outcome of this litigation, and accordingly, we can provide no assurance that we will prevail on appeal. An unfavorable outcome would have a material adverse impact on our consolidated results of operations, liquidity, and financial position.

- Barr Laboratories, Inc. (Barr), submitted an ANDA in 2002 seeking permission to market a generic version of Evista prior to the expiration of our relevant U.S. patents (expiring in 2012-2017) and alleging that these patents are invalid, not enforceable, or not infringed. In November 2002, we filed a lawsuit against Barr in the U.S. District Court for the Southern District of Indiana, seeking a ruling that these patents are valid, enforceable, and being infringed by Barr. Teva has also submitted an ANDA seeking permission to market a generic version of Evista. In June 2006, we filed a lawsuit against Teva in the U.S. District Court for the Southern District of Indiana, seeking a ruling that our relevant U.S. patents (expiring in 2012-2014) are valid, enforceable, and being infringed by Teva. No trial date has been set in either case. We believe Barr's and Teva's claims are without merit and we expect to prevail. However, it is not possible to predict or determine the outcome of this litigation, and accordingly, we can provide no assurance that we will prevail. An unfavorable outcome could have a material adverse impact on our consolidated results of operations, liquidity, and financial position.

- Sicor Pharmaceuticals, Inc. (Sicor), a subsidiary of Teva, submitted ANDAs in November 2005 seeking permission to market generic versions of Gemzar® prior to the expiration of our relevant U.S. patents (expiring in 2010 and 2013), and alleging that these patents are invalid. In February 2006, we filed a lawsuit against Sicor in the U.S. District Court for the Southern District of Indiana, seeking a ruling that these patents are valid and are being infringed by Sicor. In response to our lawsuit, Sicor filed a declaratory judgment action in the U.S. District Court for the Central District of California. The California action has since been dismissed. In September 2006, we received notice that Mayne Pharma (USA) Inc. (Mayne) filed a similar ANDA for Gemzar. In October 2006, we filed a lawsuit against Mayne in the Southern District of Indiana in response to the ANDA filing. We are awaiting the filing of an answer to our complaint against Mayne. In October 2006, we received notice that Sun Pharmaceutical Industries Inc. (Sun) filed a similar ANDA for Gemzar. We are evaluating our option to bring legal action against Sun. We expect to prevail in litigation involving our Gemzar patents and believe that claims made by these generic companies that our patents are not valid are without merit. However, it is not possible to predict or determine the outcome of such litigation, and accordingly, we can provide no assurance that we will prevail. An unfavorable outcome could have a material adverse impact on our consolidated results of operations.

In March 2004, the office of the U.S. Attorney for the Eastern District of Pennsylvania advised us that it has commenced a civil investigation related to our U.S. marketing and promotional practices, including our communications with physicians and remuneration of physician consultants and advisors, with respect to Zyprexa, Prozac, and Prozac Weekly. In October 2005, the U.S. Attorney's office advised that it is also conducting an inquiry regarding certain rebate agreements we entered into with a pharmacy benefit manager covering Axid, Evista, Humalog, Humulin, Prozac, and Zyprexa. The inquiry includes a review of Lilly's Medicaid best price reporting related to the product sales covered by the rebate agreements. We are cooperating with the U.S. Attorney in these investigations, including providing a broad range of documents and information relating to the investigations. In June 2005, we received a subpoena from the office of the Attorney General, Medicaid Fraud Control Unit, of the State of Florida, seeking production of documents relating to sales of Zyprexa and our marketing and promotional practices with respect to Zyprexa. In September 2006, we received a subpoena from the California Attorney General's office seeking production of documents related to our efforts to obtain and maintain Zyprexa's status on California's formulary, marketing and promotional practices with respect to Zyprexa, and remuneration of health care providers. It is possible that other Lilly products could become subject to investigation and that the

19

outcome of these matters could include criminal charges and fines, penalties, or other monetary or nonmonetary remedies. We cannot predict or determine the outcome of these matters or reasonably estimate the amount or range of amounts of any fines or penalties that might result from an adverse outcome. It is possible, however, that an adverse outcome could have a material adverse impact on our consolidated results of operations, liquidity, and financial position. We have implemented and continue to review and enhance a broadly based compliance program that includes comprehensive compliance-related activities designed to ensure that our marketing and promotional practices, physician communications, remuneration of health care professionals, managed care arrangements, and Medicaid best-price reporting comply with applicable laws and regulations.

We have been named as a defendant in a large number of Zyprexa product liability lawsuits in the United States and have been notified of many other claims of individuals who have not filed suit. The lawsuits and unfiled claims (together the "claims") allege a variety of injuries from the use of Zyprexa, with the majority alleging that the product caused or contributed to diabetes or high blood-glucose levels. The claims seek substantial compensatory and punitive damages and typically accuse us of inadequately testing for and warning about side effects of Zyprexa. Many of the claims also allege that we improperly promoted the drug. Almost all of the federal lawsuits are part of a Multi-District Litigation (MDL) proceeding before The Honorable Jack Weinstein in the Federal District Court for the Eastern District of New York (MDL No. 1596). The MDL includes three lawsuits requesting certification of class actions on behalf of those who allegedly suffered injuries from the administration of Zyprexa. We have entered into agreements with various plaintiffs' counsel halting the running of the statutes of limitation (tolling agreements) with respect to a number of claimants who do not have lawsuits on file.

Since June 2005, we have entered into agreements with various claimants' attorneys involved in U.S. Zyprexa product liability litigation to settle approximately 10,500 claims, including a large number of previously filed lawsuits (including the three purported class actions mentioned above), tolled claims, and other informally asserted claims. The settlements are being overseen and distributed by court-approved claims administrators.

The U.S. Zyprexa product liability claims not subject to these agreements include approximately 1,500 lawsuits in the U.S. covering approximately 9,700 claimants, and approximately 850 tolled claims. The first trials are scheduled for April 2007 in the Federal District Court for the Eastern District of New York. In addition, we have been served with a lawsuit seeking class certification in which the members of the purported class are seeking refunds and medical monitoring. Finally, in early 2005, we were served with four lawsuits seeking class-action status in Canada on behalf of patients who took Zyprexa. One of these four lawsuits has been certified for certain residents of Quebec. The allegations in the Canadian actions are similar to those in the litigation pending in the United States. We are prepared to continue our vigorous defense of Zyprexa in all remaining cases.

In December 2004, we were served with two lawsuits brought in state court in Louisiana on behalf of the Louisiana Department of Health and Hospitals, alleging that Zyprexa caused or contributed to diabetes or high blood-glucose levels, and that we improperly promoted the drug. These cases have been removed to federal court and are now part of the MDL proceedings in the Eastern District of New York. In these actions, the Department of Health and Hospitals seeks to recover the costs it paid for Zyprexa through Medicaid and other drug-benefit programs, as well as the costs the department alleges it has incurred and will incur to treat Zyprexa-related illnesses. In 2006, we were served with similar lawsuits filed by the states of Alaska, West Virginia, Mississippi, and New Mexico in the courts of the respective states.

In 2005, two lawsuits were filed in the Eastern District of New York purporting to be nationwide class actions on behalf of all consumers and third-party payors, excluding governmental entities, that have made or will make payments for their members or insured patients being prescribed Zyprexa. These actions have now been consolidated into a single lawsuit, which is brought under certain state consumer-protection statutes, the federal civil RICO statute, and common law theories, seeking a refund of the cost of Zyprexa, treble damages, punitive damages, and attorneys' fees. Four additional lawsuits were filed in 2006: two in the Eastern District of New York, one in the Southern District of Indiana, and one in Indiana state court, all on similar grounds. As with the product liability suits, these lawsuits allege that we inadequately tested for and warned about side effects of Zyprexa and improperly promoted the drug.

We have insurance coverage for a portion of our Zyprexa product liability claims exposure. The third-party insurance carriers have raised defenses to their liability under the policies and are seeking to rescind the policies. The dispute is now the subject of litigation in the federal court in Indianapolis against certain carriers and in arbitration in Bermuda against other carriers. While we believe our position is meritorious, there can be no assurance that we will prevail.

In addition, we have been named as a defendant in numerous other product liability lawsuits involving primarily diethylstilbestrol (DES) and thimerosal.

With respect to the product liability claims currently asserted against us, we have accrued for our estimated exposures to the extent they are both probable and estimable based on the information available to us. In addition, we have accrued for certain product liability claims incurred but not filed to the extent we can formulate a reasonable estimate of their costs. We estimate these expenses based primarily on historical claims experience and data regarding product usage. Legal defense costs expected to be incurred in

connection with significant product liability loss contingencies are accrued when probable and reasonably estimable. A portion of the costs associated with defending and disposing of these suits is covered by insurance. We record receivables for insurance-related recoveries when it is probable they will be realized. These receivables are classified as a reduction of the litigation charges on the statement of income. We estimate insurance recoverables based on existing deductibles, coverage limits, our assessment of any defenses to coverage that might be raised by the carriers, and the existing and projected future level of insolvencies among the insurance carriers.

In the second quarter of 2005, we recorded a net pre-tax charge of $1.07 billion for product liability matters. The $1.07 billion net charge takes into account our estimated recoveries from our insurance coverage related to these matters. The charge covers the following:

- The cost of the Zyprexa settlements described above; and,
- Reserves for product liability exposures and defense costs regarding currently known and expected claims to the extent we can formulate a reasonable estimate of the probable number and cost of the claims. A substantial majority of these exposures and costs relate to current and expected Zyprexa claims not included in the settlements. We have estimated these charges based primarily on historical claims experience, data regarding product usage, and our historical product liability defense cost experience.

During 2005, $700.0 million was paid in connection with Zyprexa settlements, while the cash related to other reserves for product liability exposures and defense costs is expected to be paid out over the next several years, including 2006. The timing of our insurance recoveries is uncertain.

We cannot predict with certainty the additional number of lawsuits and claims that may be asserted. In addition, although we believe it is probable, there can be no assurance that the Zyprexa settlements described above will be concluded. The ultimate resolution of Zyprexa product liability and related litigation could have a material adverse impact on our consolidated results of operations, liquidity, and financial position.

Because of the nature of pharmaceutical products, it is possible that we could become subject to large numbers of product liability claims for other products in the future. We have experienced difficulties in obtaining product liability insurance due to a very restrictive insurance market, and therefore will be largely self-insured for future product liability losses. In addition, as noted above, there is no assurance that we will be able to fully collect from our insurance carriers on past claims.

In June 2002, we were sued by Ariad Pharmaceuticals, Inc., the Massachusetts Institute of Technology, the Whitehead Institute for Biomedical Research and the President and Fellows of Harvard College in the U.S. District Court for the District of Massachusetts alleging that sales of two of our products, Xigris® and Evista, were inducing the infringement of a patent related to the discovery of a natural cell signaling phenomenon in the human body and seeking royalties on past and future sales of these products. We believe that these allegations are without legal merit and that we will ultimately prevail on these issues. In June 2005, the United States Patent and Trademark Office commenced a re-examination of the patent in order to consider certain issues raised by us relating to the validity of the patent. A jury trial commenced in Boston on April 10, 2006 on the patent validity and infringement issues. On May 4, 2006, the jury issued an initial decision in the case that Xigris and Evista sales infringe the patent. The jury awarded the plaintiffs approximately $65 million in damages, calculated by applying a 2.3 percent royalty to all U.S. sales of Xigris and Evista from the date of issuance of the patent through the date of trial. We will seek to have the jury verdict overturned by the trial court judge, and if unsuccessful, will appeal the decision to the Court of Appeals for the Federal Circuit. In addition, a separate bench trial with the U.S. District Court of Massachusetts was held the week of August 7, 2006, on our contention that the patent is unenforceable and impermissibly covers natural processes. No decision has been rendered.

Also, under the Comprehensive Environmental Response, Compensation, and Liability Act, commonly known as Superfund, we have been designated as one of several potentially responsible parties with respect to fewer than 10 sites. Under Superfund, each responsible party may be jointly and severally liable for the entire amount of the cleanup. We also continue remediation of certain of our own sites. We have accrued for estimated Superfund cleanup costs, remediation, and certain other environmental matters. This takes into account, as applicable, available information regarding site conditions, potential cleanup methods, estimated costs, and the extent to which other parties can be expected to contribute to payment of those costs. We have reached a settlement with our liability insurance carriers providing for coverage for certain environmental liabilities.

The litigation accruals and environmental liabilities and the related estimated insurance recoverables have been reflected on a gross basis as liabilities and assets, respectively, on our consolidated balance sheets.

While it is not possible to predict or determine the outcome of the patent, product liability, or other legal actions brought against us or the ultimate cost of environmental matters, we believe that, except as noted above, the resolution of all such matters will not have a

21

material adverse effect on our consolidated financial position or liquidity, but could possibly be material to the consolidated results of operations in any one accounting period.

FINANCIAL EXPECTATIONS FOR 2006

For the full year of 2006, we expect earnings per share to be in the range of $3.07 to $3.18. This guidance reflects the closure of the Hamburg, Germany research and development facility previously discussed, which will result in a fourth-quarter charge to asset impairment, restructuring and other special charges of $40 million to $50 million (pretax), or $.02 to $.03 per share (after tax). It does not, however, reflect any other future material unusual items, such as the impact of the ICOS acquisition, including the IPR&D charge, if the transaction closes in 2006. Nor does it include any charges that may occur if further decisions are reached related to our other two European sites.

We expect full-year 2006 sales to grow at approximately the low end of 7 percent to 9 percent growth range. In addition, we expect gross margins as a percent of sales to improve, operating expenses to grow in the mid-single digits in the aggregate, and other income — net, to contribute approximately $175 million to $250 million. Excluding the tax associated with the potential charges discussed above, we also anticipate the effective tax rate to be approximately 21 percent. In terms of cash flow, we expect capital expenditures to be at approximately $1.2 billion in 2006.

We caution investors that any forward-looking statements or projections made by us, including those above, are based on management's belief at the time they are made. However, they are subject to risks and uncertainties. Actual results could differ materially and will depend on, among other things, the continuing growth of our currently marketed products; developments with competitive products; the timing and scope of regulatory approvals and the success of our new product launches; asset impairments, restructurings, and acquisitions of compounds under development resulting in acquired in-process research and development charges; foreign exchange rates; wholesaler inventory changes; the outcome of the Zyprexa patent appeal; other regulatory developments, government investigations, patent disputes, and litigation; and the impact of governmental actions regarding pricing, importation, and reimbursement for pharmaceuticals. Other factors that may affect our operations and prospects are discussed in Item 1A of our 2005 Form 10-K, "Risk Factors." We undertake no duty to update these forward-looking statements.

AVAILABLE INFORMATION ON OUR WEBSITE

We make available through our company website, free of charge, our company filings with the Securities and Exchange Commission (SEC) as soon as reasonably practicable after we electronically file them with or furnish them to the SEC. The reports we make available include annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, proxy statements, registration statements, and any amendments to those documents.

The website link to our SEC filings is http://investor.lilly.com/edgar.cfm.

*Item 4. Controls and Procedures*

(a) *Evaluation of Disclosure Controls and Procedures.* Under applicable SEC regulations, management of a reporting company, with the participation of the principal executive officer and principal financial officer, must periodically evaluate the company's "disclosure controls and procedures," which are defined generally as controls and other procedures of a reporting company designed to ensure that information required to be disclosed by the reporting company in its periodic reports filed with the commission (such as this Form 10-Q) is recorded, processed, summarized, and reported on a timely basis.

Our management, with the participation of Sidney Taurel, chairman and chief executive officer, and Derica W. Rice, senior vice president and chief financial officer, evaluated our disclosure controls and procedures as of September 30, 2006, and concluded that they are effective.

(b) *Changes in Internal Controls.* During the third quarter of 2006, there were no changes in our internal control over financial reporting that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

PART II. OTHER INFORMATION

*Item 1. Legal Proceedings*

See Part I, Item 2, Management's Discussion and Analysis, "Legal and Regulatory Matters," for information on various legal proceedings, including but not limited to:

- The U.S. patent litigation involving Zyprexa, Evista, and Gemzar